IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| RICHARDSON VAN LEEUWEN CONSTRUCTION COMPANY, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> BOX B, LLC, and SHANNON TRACY, <br><br> Defendants. | ORDER <br> AND <br> MEMORANDUM DECISION <br><br> Case No. 2:04-CV-1192 TC |

## INTRODUCTION

This diversity action arises out of a contract dispute between Plaintiff Richardson Van

Leeuwen Construction Company, LLC ("RVC") and Defendants Box B, LLC and Shannon Tracy

(collectively "Box B" unless otherwise noted) concerning the design and planned construction of

a hotel in Nauvoo, Illinois.  Both parties claim that the other breached the contract.  The parties

tried the case to the court between October 16 and 19, 2006.

For the reasons explained below, the court concludes that RVC did not breach the

contract, but that Box B materially breached the contract and is liable to RVC for damages of

$249,837.25 plus interest, as detailed below.

## FINDINGS OF FACT

 Box B, LLC is an Arizona limited liability company based in Mesa, Arizona.  Box B,

LLC was formed to build, own and operate a hotel (the Hyrum Kimball Inn) in Nauvoo, Illinois

(the "Project").  Defendant Shannon Michael Tracy resides in Mesa, Arizona.  Mr. Tracy is one

of the managing members of Box B, LLC.  Plaintiff RVC is a Utah limited liability company

principally based in Salt Lake City, Utah.  RVC was the design/build general contractor on the

Project.  Dennis Max Van Leeuwen is one of the principals of RVC and manages its operations.

On January 28, 2004, the parties signed Part 1 of an AIA [American Institute of

Architects] A191 form contract titled "Standard Form of Agreements Between Owner and

Design/Builder."  Part 1 of the form contract is referred to in this order as the "Contract."  (See

Trial Ex. 3.)  The parties ended their relationship before signing Part 2 of the form contract.

The Contract required Box B ("the Owner") to pay RVC ("the Design/Builder") 4.7% of

the estimated cost of construction, $5,700,000.00.  (Box B provided this figure.)  (See Contract

(Trial Ex. 3) ¶ 9.1.1.)  Mr. Van Leeuwen explained the purpose of the 4.7% provision:

> That is the fee schedule that is now set for the architect.  And throughout the
> design/build process, as the number of the construction and the estimates change,
> the design/builder and the architects track where those changes are.  When the
> final bid documents are complete, and the final number for the design or the
> construction is agreed upon or determined, that 4.7 percent then is calculated off
> of the final construction cost.

(Oct. 16, 2006 Tr. at 72.)  The parties understood that this estimated cost of $5.7 million could

change as the Project was designed and bid and a final cost of construction was determined.

Indeed, the parties agreed that the $5.7 million figure was a preliminary figure and that RVC did

not guarantee that it could build the Project for that amount.

Once the Contract was signed, RVC hired Richardson Design Partnership ("RDP"), a

licensed architectural firm located in Salt Lake City, Utah, to perform the architectural design

services for the Project.  Lloyd Rappleye, a managing member and principal of Box B, was

actively involved and collaborated with RDP during the design phase of the Project.

In late September 2004, RDP gave RVC the Project Manual for distribution to Project bidders. The Project Manual included Project specifications, a consultant's directory, an invitation and instructions for bidders, a bid proposal form, sample contracts and performance bonds, geotechnical reports, applications for payment, and an index of the construction drawings. In October of that year, RDP completed the construction drawings for the Project and delivered them to RVC to initiate bidding on the Project. (The Construction Drawings and the Project Manual are referred to collectively as the "Construction Documents.") Over the next three weeks, RVC received bids from subcontractors and suppliers in its effort to develop the Project budget.

On November 2, 2004, after reviewing the bids, RVC presented its preliminary budget for the Project to Box B. The total amount of the preliminary budget was $13,784,384.31. Although Box B recognized that the actual budget for the Project would be more than the preliminary figure of $5.7 million, the principals of Box B were "very surprised" by the March 27, 2007 $13,784,384.31 figure. (Oct. 18, 2006 Tr. at 93.) According to Lloyd Rappleye, based on their discussions with RVC, Box B believed that RVC could build the Project for approximately $78.00 per square foot, but that the cost under the preliminary budget was closer to $130.00 per square foot.

There were a number of reasons for the increased cost. In April 2004, Box B changed the location where the Project would be built. Mr. Van Leeuwen described various changes (and costs) that resulted from the different site:

And when we went to [site] two, not only was initially the condition of the soil up

in the [air], no hydrology reports, no civil engineering had been done on that site, but the building itself had to be reconfigured to an extent.  Parking lots were different, the entrance, the streets that the buildings sided up against.  The site was quite low and didn't work.  There was over 18,000 tons of fill that needed to be brought in.

(Oct. 16, 2006 Tr. at 75.)

Another reason for the increased cost was Box B's desire that an ICF[1] or ecoblock system and a four-pipe HVAC mechanical system be used in the Project.  Early in the design process, Joseph Coates, an architect from RDP who was working on the Project with RVC, told Box B that the two systems were expensive and would increase the cost of the Project.  Mr. Van Leeuwen had also told Box B the same.

The size of the hotel rooms that Box B wanted also added to the cost increase.  According to Mr. Van Leeuwen,

when you start changing components such as this [room size] you have a real domino effect throughout all of the different types of construction.  A larger room for instance means that you can no longer use just one piece of carpet in a room.  . . . [W]hen the thousand of bits and pieces are added up, they change the price of a project substantially.

(Id. at 81-82.)

In an effort to reduce costs, RVC spent the next three weeks "value engineering" the Project.  On November 22, 2004, RVC presented its revised budget to Box B.  Even though the revisions reduced the total preliminary budget by approximately four million dollars, the revised budget was  more than Box B was willing (or able) to spend on the Project.

---

[1]Mr. Van Leeuwen described an ICF system: "If you were to envision Legos that are hollow, you would stack these foam forms that look like Legos, very big Legos on top of each other.  You lay rebar within them, and then you pour concrete or grout down inside of them." (Oct. 16 Tr. at 81.)

At the November 22 meeting, Box B asked RVC: (1) to reduce its contractor fee for building the hotel from 7.5% to 6.5% of construction costs, and (2) to eliminate a contractor fee for costs in the general conditions categories.  (The next day Mr. VanLeeuwen sent a letter to Box B agreeing to eliminate contractor's fees for general conditions categories and to reduce the contractor's fees to 7%.  (See Letter of Nov. 23, 2004 (Trial Ex. 4).)

At the conclusion of the November 22, 2004 meeting, Box B directed RVC to start the Project.  RVC contacted the key subcontractors, moved heavy equipment on site to begin excavations, and finalized the budget spreadsheets so that Box B could submit them to its lender. At this point, the final cost of construction in the budget was $10,524,672.00.  As part of the design/build process, RVC was committed to continue its value engineering as construction proceeded in an effort to further reduce the cost.

On November 24, 2004, Mr. Rappleye faxed a document that Mr. Van Leeuwen had created at Box B's request (a comparison of the costs to build the Project with ICF construction versus stick framing construction) to Tim Tyrrell, a subcontractor who had submitted a bid to RVC for a significant portion of the work on the Project.  Box B also gave Mr. Tyrrell RVC's final budget figure from the November 22 meeting.  Mr. Tyrrell and Mr.Van Leeuwen had worked together in the bidding and the value engineering portions of the Project, and RVC considered Mr. Tyrell one of its prime subcontractors on the Project.  Box B was aware of Mr. Tyrrell's relationship with RVC.

After reviewing RVC's materials, Mr. Tyrell told Box B that he could build the Project for several million dollars less than RVC's preliminary budget figure.  A short time later, the principals of Box B met with Mr. Tyrrell in Mesa, Arizona, to discuss the possibility of Mr.

Tyrell becoming the general contractor on the Project.

On November 30, 2004,  Mr. Van Leeuwen and Mr. Ray Lewis Clayton (a member of Box B and its Chief Financial Officer) spoke by telephone.  Mr. Clayton told Mr. Van Leeuwen that Box B had decided to solicit bids from other contractors.  Mr. Van Leeuwen immediately wrote Mr. Tracy, telling him that he had learned that Box B had contacted Mr. Tyrell and that RVC considered this action a material breach of the Contract.  He demanded immediate return of the Construction Documents.  (Letter of Dec. 2, 2004 (Trial Ex.18).)  Box B did not respond to the letter.  Shortly thereafter, Mr. Van Leeuwen notified Mr. Tyrell and various subcontractors that the Construction Documents must be returned to RVC.

On Sunday, December 5, 2004, Mr. Tyrell sent an e-mail to Mr. Rappleye telling him that "[m]y precast supplier submitted his bid yesterday, and they where [sic] $45,000.00 less than what Dennis [Van Leeuwen] had from another supplier and deduct caissons @ $156,000.00, that's $201,000.00 less in just two areas.  Nice amount of savings."  (Dec. 5, 2004 e-mail (Trial Ex. 8).)  Because the Construction Documents prepared by RVC were the only ones for the Project at that time, there is little doubt that Mr. Tyrrell was using these documents to obtain bids.

On Friday, December 10, 2004, Mr. Van Leeuwen wrote Mr. Tracy and outlined RVC's position regarding the total amount due under the Contract for architecture design work, for work performed by RVC, and for reimbursable costs related to the Project.  The amount was $90,357.69.  Mr. Van Leeuwen offered to sell the Construction Documents to Box B for $155,100.00.  (Letter of Dec. 10, 2004 (Trial Ex. 19).)  Box B rejected RVC's offer to purchase the Construction Documents and contended that the documents belonged to Box B.

In December 2004, after RVC and Box B had ended their relationship, Box B hired a designer, Harvey Val Killian, to work on the Project.  Box B gave a set of the Construction Drawings to Mr. Killian.  Although Mr. Killian testified that he did not copy or trace the drawings, he admitted that he reviewed the Construction Drawings, and tore out certain pages from the Construction Documents which he used while he created hand sketches of his ideas for the Project.  Mr. Killian intended to send the hand sketches to the new architect to incorporate into architectural drawings.  Mr. Rappleye continued to refer to the Construction Drawings during the redesign of the Project and sent Mr. Killian messages about certain features of the Construction Drawings.

On January 25, 2005, Hyrum Kimball Inn, LLC, an entity separate from Box B, but whose sole members were Mr. Tracy, Mr. Clayton and Mr. Rappleye, entered into an agreement with an architectural firm, Lightowler Johnson, to perform architectural services for the Project for $87,000.[2]  At trial, Mr. Coates (an RDP architect) testified that he had reviewed the drawings prepared by Lightowler Johnson with those he had prepared for the Project.  In court, he identified several of the design features of the Lightowler Johnson plans that were identical to design features in the drawings Mr. Coates had made.  (See Oct. 17, 2006 Tr. at 79-85.)

The Project remains unfinished.

---

[2]During discovery in this litigation, the only Project Manual produced by Box B and Lightowler Johnson was the one created by RDP.

## CONCLUSIONS OF LAW

1.      **Jurisdiction and Venue**

The Contract provides that disputes arising out of the Contract are subject to mediation

and arbitration.  (Contract ¶ 6.1.)  But the parties have waived their right to either mediation or

arbitration.  See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1489 (10th

Cir. 1994) (noting that a party, through its actions or inactions, can waive a contractual right to

arbitrate).  There are a number of reasons that the court reaches this conclusion.  First, to exercise

the right to arbitration or mediation, the Contract requires that a party make written demand for

mediation and/or arbitration to the other party and with the American Arbitration Association.

(Contract ¶¶ 6.2, 6.3.)  Neither party has made formal written demand for mediation or

arbitration to the other party or to the American Arbitration Association.  Second, both parties

actively participated in discovery and the litigation process.  (RVC filed its complaint, Box B

filed an answer and a counterclaim.)  Third, in the Pretrial Order, although Box B asserted that

RVC's claims were barred because RVC did not submit the dispute to arbitration or mediation,

the parties agreed that "[t]he jurisdiction of the court is not disputed and is hereby determined to

be present." (Pretrial Order ¶ 1.)

The parties do not dispute that venue is proper here.

2.      **Box B Materially Breached the Contract.**

The Contract makes clear that the Construction Documents belonged to RVC.  (Contract

¶ 3.1.)  The Contract instructs that if the parties do not sign Part 2 of the form contract (which

they did not), Box B could not use any of RVC's documents, including the Construction

Documents, without RVC's written permission.  (Id. ¶ 3.2.)  In clear violation of this provision,

Box B gave the Construction Documents to Tim Tyrell, who used them to obtain competitive bids, and to Val Killian, who referred to the Construction Documents as he made hand sketches for the Project. And many of the architectural features that Mr. Coates had designed for the Project were incorporated into the drawings prepared by Lightowler Johnson. RVC did not give Box B permission to use the documents and, in fact, had expressly demanded their return.

**3.     RVC Did Not Breach the Contract.**

In its Amended Counterclaim, Box B claimed that RVC breached the Contract in a number of ways. (Am. Answer & Countercl. at 4-7.) At the heart of Box B's claims is its contention that RVC's proposed budget exceeded "the budget figure stated in the project" (presumably the $5.7 million figure), and that RVC "fail[ed] to disclose deviations from [Box B's] program . . . ." (Id. at 4-5.) Finally, Box B argues that RVC did not act in good faith in its dealings with Box B.

        a.     Exceeding a Budget Figure

RVC was not required to meet a particular budget figure. The $5.7 million was described in the Contract as "the estimated cost of construction." (Contract ¶ 9.1.1.) Mr. Rappleye acknowledged at trial that he recognized that the $5.7 million was a "ballpark figure." (Oct. 18 Tr. at 93.)

        b.     Failing to Disclose Deviations

It appears that Box B is contending that RVC's primary deviation from Box B's program was RVC's resistance to using an ICF system and a four-pipe HVAC system. But the record is clear that throughout the design of the Project, Mr. Van Leeuwen and Mr. Coates told Box B that use of an ICF system and a four-pipe HVAC system would substantially increase the cost of the

Project.  In fact, at the November 22 meeting, at Box B's request Mr. Van Leeuwen gave Mr.

Rappleye a written comparison of the difference in cost between ICF construction and stick-

frame construction. (See Oct. 19 Tr. at 20; "Cost analysis of ICF v. Conventional Framing" (Trial

Ex. 9).)  Mr. Coates testified that early in the design process, he told Box B that he had concerns

about the cost of the Project if the ICF and four-pipe HVAC systems were used.  (Oct. 17 Tr. at

72-73.)

> c.      RVC Acted in Good Faith.

Although RVC's proposed budgets were greater than what Box B expected and wanted,

the evidence shows that the higher figures were mainly a result of Box B's own actions and

expectations.  Box B wanted special features, such as oversized rooms, in the hotel and an

expensive type of construction.  Moreover, Box B changed the location of the site after the

Contract was signed.  It was very clear from the evidence that RVC, in order to comply with Box

B's expectations and to design and construct a building that would be suitable for the new site,

had to change its budget figures, which were arrived at in good faith.  And, at the time that Box B

breached the Contract, RVC was committed to continue its efforts to lower costs whenever

possible.

**4.      Box B is Liable to RVC for Damages.**

 Box B paid RVC $247,253.36.  But Box B was delinquent in its payments to RVC

during the life of the Contract.  As of November 30, 2004, Box B owed RVC $44,791.26 for

unpaid architectural services.  (See Contract ¶ 5.2; Pl.'s Summ. of Damages (Trial Ex. 11); Oct.

16 Tr. at 129, 135-36.)  Box B owed RVC $45,566.43 for reimbursable expenses incurred by

RVC.  (Contract ¶ 5.2; Pl.'s Summ. of Damages (Trial Ex. 11); Dec. 10, 2004 Letter (Trial Ex.

19.)  Box B owed Lisman Richardson Interior Design $3,248.75 for interior design work, and

Lisman Richardson assigned its rights to outstanding receivables from Box B to RVC.  (May 27,

2005 Assignment (Trial Ex. 12); Pl.'s Summ. of Damages (Trial Ex. 11).)  Box B also owed

Lisman Richardson $1,130.81 interest on the unpaid design work.  Because of the assignment

between Lisman Richardson and RVC, that amount is now owed to RVC.  (See July 23, 2004

Client Agreement (Trial Ex. 50); Pl.'s Summ. of Damages (Trial Ex. 11).)  These amounts in

combination total $94,737.25.

RVC argues that Box B also owes it $230,300 for the balance of the architectural fee

"based upon final estimated cost of construction as of November 23, 2004" and $411,200 for

"[v]alue [d]erived by Defendants through use of Plaintiff's Construction Documents, minus

amounts paid for substitute architectural services."  (Pl.'s Summ. of Damages (Trial Ex. 11).)

RVC's right to these damage amounts is less clear-cut.

Mr. Van Leeuwen explained that RVC was owed $230,300 as "the balance of the

architectural fee."  (Id.)  RVC argues that Section 9.1.1 of the Contract obligates Box B to pay

4.7% of the final cost of construction.  And RVC contends that the final cost of construction was

$10,534,572.00, the budget figure that RVC presented to Box at the November 22 meeting.  But

there are problems with this argument.  First, at the November 22 meeting, although Box B

apparently agreed that RVC should continue work on the Project, the record makes clear that

$10,534,572 was not an agreed-upon final figure.  Mr. Van Leeuwen explained:

> That's the number [$10,534,572] at that point in time that was determined and I
> would be giving back to them for the purposes of going to the bank.  That number
> — though, however, we were still going to continue to do more value engineering

and tighten up that number from there.  But it was felt at that point this number is
as good as any for right now.  Let's get the project moving.

(Oct. 16 Tr. at 117-18.)

There is no evidence establishing what a final figure would have been had RVC and

Box B signed Part 2 of the form contract and actually constructed the Project.  The first value

engineering done by RVC resulted in a cost reduction of four million dollars.  There is nothing to

show whether continued value reduction would have reduced the cost by another four million, or

a smaller amount or a larger amount.  RVC has not proved that it is entitled to recover for these

claimed damages.  RVC had the burden of proving damages to a reasonable degree of certainty

and damages may not be awarded on the basis of conjecture or speculation.  See, e.g., Renegade

Oil, Inc. v. Progressive Cas. Ins. Co., 101 P.3d 383, 386 (Utah Ct. App. 2004) (holding that

plaintiff has burden of proving damages);  ProMax Dev. Corp. v. Mattson, 943 P.2d 247, 255

(Utah Ct. App. 1997) ("to prove the amount of damages, the evidence must 'rise[] above

speculation and provide[] a reasonable, even though not necessarily precise, estimate of

damages'") (quoting Atkin Wright & Miles v. Mountain States Tel. & Tel. Co., 709 P.2d 330,

334 (Utah 1985)).  RVC simply has not met its burden and is not entitled to recover for this

claimed amount.

The final item of damages RVC seeks is $411,200 for "Value Derived by Defendants

through use of Plaintiff's Construction Documents, minus amounts paid for substitute

architectural services." (Pl.'s Summ. of Damages (Trial Ex. 11).)  Although the court has

concluded that Box B breached the Contract by its unauthorized use of the Construction

Documents, the court does not find RVC's method of calculating damages persuasive.  RVC

appears to have acknowledged that there are questions about this item.  RVC wrote in its

Proposed Findings of Fact and Conclusions of Law:

> The Contract does not clearly address the method of calculating damages for
> materially breaching Article 3.2 [which precludes Box B from using the
> Construction Documents].  The most reasonable method is to use the Contract
> terms to calculate the damage.  Using those terms the calculation is 4.7% of the
> final cost of construction which, as of November 22, 2004, amounted to
> approximately $10.6 million (4.7% x $10,600,000.00 = $498,200.00), less the
> $87,000 it contracted to pay Lightowler Johnson for architectural services, for a
> total of $411,200.00.

(Pl.'s Proposed Findings of Fact & Conclusions of Law ¶ 110.)

But this method relies on the $10,534,572 final construction amount that the court has

found to be speculative.  A less speculative, more reasonable figure is $155,100.00, the amount

for which RVC offered to sell the Construction Documents to Box B on December 10, 2004,

before litigation began.  Accordingly, in lieu of the proposed $411,200.00, the court awards RVC

$155,100.00 as well.

RVC is also entitled to interest of 1.5% per month for "past due payments." (Contract

¶ 9.5.1.)

Based on the above, the court concludes that Box B owes RVC $249,837.25 in damages,

plus 1.5% interest per month for unpaid architectural services and reimbursable expenses as set

forth above.

## ORDER

For the foregoing reasons, and based on the court's finding that Box B is liable to RVC

for breach of the Contract, it is hereby ORDERED that Box B shall pay damages to RVC in an

amount totaling $249,837.25, plus 1.5% interest per month for unpaid architectural services and

reimbursable expenses, which amount is to be calculated by RVC.  RVC shall calculate the

interest consistent with the court's damages analysis above, and shall present that amount, along

with the $249,837.25, to the court in a proposed judgment.

      DATED this 28th day of March, 2007.

BY THE COURT:

TENA CAMPBELL
Chief Judge